Dr. Oscar E. HUBBARD et ux., Appellants,

v.

HARRIS COUNTY FLOOD CONTROL
DISTRICT, Appellee.

No. 12916.

Court of Civil Appeals of Texas.

Galveston.

Jan. 12, 1956.

Rehearing Denied Feb. 2, 1956.

Burke Holman, County Atty. of Harris County, Madison Rayburn, Asst. County Atty., and James R. Gough, Sp. Asst. County Atty., Houston, for appellee.

GANNON, Justice.

Appeal by defendants in a condemnation suit. The parties will be referred to as in the trial court.

The case was tried solely on the issue of damages. There was a stipulation between the parties that the proceedings, including the condemnor's right to take and use an easement over defendants' land, were in all things regular and in accordance with law, and that value should be fixed as of June 17, 1954. It was also stipulated that "plaintiffs" duly and timely filed objection to the commissioners' award. We construe the word "plaintiffs" as used in that portion of the stipulation to mean defendants, Oscar E. Hubbard and wife, Alice, since apparently no objection was made to the commissioners' award of $9,949.70 by the plaintiff District, which paid that amount into court and presumably went into possession.

The petition seeks and the judgment awards an easement and right of way for the construction of flood control and drainage works across defendants' tract of land comprising 0.365 acre. The tract is located within the City of Houston at 1503 Wyndale Drive. It is bounded on the north by Bray's Bayou, is irregular in shape and generally speaking is in the Shamrock Hotel, *Prudential Building* and *Medical Center* area. The lot is approximately 230 feet in frontage on Wyndale and runs back north to the Bayou with an average depth of approximately 55 feet. Though stipulated to contain 15,405 square feet, the tract is treated by the parties as containing 15,899 square feet. According to defendants' witness, Holland, it is located in "a little, forgotten area that the City grew up around." Testimony on valuation of the land is widely variant, ranging from a low of 30 cents to a high of $3.25 to $3.50 per square foot. The only improvement is a wooden shack valued by the witnesses from a low of $1,344 to a high of $3,000. Both

Morris Bogdanow and Al L. Crystal, Houston, for appellants.

of these values come from plaintiff's witnesses. The jury returned a verdict fixing the value of the land and improvements at $6,355.60. Plaintiff's witnesses strongly contend that the location of the tract on the Bayou, considered together with its size and shape, limit its usefulness to a point where the value of the land is hardly comparable to various other tracts in the vicinity, plaintiff asserting—in this connection—that the tract's location on the Bayou subjects it to erosion, and that because of its location and shape the cost of foundations for any suitable improvements would be disproportionately high and costly in relation to the cost of the improvements themselves.

Defendants bring the case to us on 20 points of error. Three of these, being points 15, 16 and 17, are not briefed and are, therefore, abandoned.

 By their first point appellants claim that the witness Gallagher was permitted to testify over their objection to the effect "That the taking of the defendants' property in condemnation was a necessity due to high waters, overflows and erosion at various portions of Bray's Bayou," saying that such testimony was prejudicial and calculated to cause the jury to base its verdict "upon the gain to plaintiff and not the loss to defendants." Not only have we carefully considered the statement made by defendants under this point, but we have read the testimony of the witness Gallagher in its entirety. We wholly fail to find therein any testimony that could possibly be construed as stating that the taking of the property in condemnation was a necessity, as claimed by defendants. The witness did testify that the property was located on the banks of Bray's Bayou and that it was subject to erosion which would necessitate relatively high cost for foundations should the property be improved. This testimony bore directly on the question of value. The witness' training and experience as a civil engineer rendered him competent to give it and the evidence was unquestionably relevant. We see no merit in this point.

Defendants' points 2, 3, 4, 5, 6, 8, 9 and 10, being eight in number, are grouped for statement and discussion. It is true that some of the points are similar, certainly overlapping, and frequently duplicitous, sometimes identical in part, but others are not germane to any in the group. We, therefore, break them down for discussion, treating together only those, or parts of same, which we consider germane to each other.

██ ██ By their second, third, fifth, sixth and tenth points appellants raise the competency of the witness, W. E. Thompson, to testify as an expert. These points are largely argumentative, apparently taking the position that Thompson was not qualified as an expert, because he first saw the property some months after the agreed valuation date, to wit, on February 5, 1955, and because he did not testify there was no fluctuation in prices between June 17, 1954, the valuation date, and February 5, 1955. It is further claimed that the value of the property was not within the scope of this witness' knowledge, personal or otherwise, apparently because he neither bought, sold, leased, nor owned any comparable real estate in the area involved and because he had no information direct from the owners of property who had made sales in the area.

In Housing Authority of City of Galveston v. Henderson, Tex.Civ.App., 1954, 267 S.W.2d 843, we held that the statement of a valuation witness that he knows the market value of property is alone sufficient prima facie to warrant the trial court in holding the witness qualified and that any contradictory evidence would serve at most to weaken the prima facie showing.

Not only did the witness Thompson testify that he knew the value of the property, as of the date in issue, June 17, 1954, but it appeared that he was a real estate broker and by profession a land appraiser, having been in the real estate mortgage and land trading business over fifty years, sixteen years of which he had been located in Houston. He regularly did appraisal work and had devoted himself for several years immediately before testifying mostly to ap-

praising for banks, individuals and institutions. The witness did testify he had not seen the particular tract in controversy before February 5, 1955, but that in accordance with the usage of his profession of appraiser he could reliably value the land as of June 17, 1954, assuming no material change in condition, which was established. The witness had investigated other property in the general area in 1954 and was generally familiar with values there as of June 17, 1954. On the basis of the witness' training, experience, observation and general familiarity with the area and taking into consideration various sales therein, he valued the subject property at $10,000.00, allocating $7,000.00 to the land and $3,000.00 to the building. The witness unreservedly testified that recent trends in the area had been upward but considered this piece of land of limited "usability." In this witness' opinion a cheap apartment building was the highest and best use for the land, taking into consideration other improvements in the general area. In estimating its value the witness took into consideration various other sales in the area, including a tract across the street of seven and a fraction acres, which the witness said was better located and which had recently sold for approximately $10,000 an acre. The witness had previously appraised land in the area in 1954. He testified he was about as familiar with values there as anybody "because my job has been to watch every sale made for 15 years."

It is apparent that the witness testified to a valuation as of June 17, 1954, not February 5, 1955. It is equally apparent to us that legally he was a competent witness to express himself on values as of June 17, 1954. It is not necessary that an expert on values should have personally either owned, leased or sold property in the area under inquiry.

We overrule these points.

■ By their fourth point appellants say it was error for the court to permit Mr. Thompson to testify as to values because he "did not take into consideration any comparable land in the area, he having merely

limited himself to land south of Bray's Bayou and leaving out of consideration land north of the Bayou." On its face the point begs an issue which was sharply contested in the evidence. All of plaintiff's witnesses on values drew a clear and marked distinction between land north of the Bayou on paved through thoroughfares upon which were located such structures as the Shamrock Hotel, the Prudential Building and Park Towers Apartments, and land south of the Bayou such as defendants' land which one of defendants' witnesses described as "a little forgotten area that the City grew up around." At best defendants' complaint goes properly only to the weight of the testimony. The point is overruled.

■ ■ By their fifth point defendants complain of the court permitting Thompson to testify as to values not only on the basis of his incompetency as an appraiser, which we have already discussed, but "Because the values placed thereon by him were exceedingly lower than any comparable land in the area." In fact Thompson placed a higher value on the land and improvements than at least one other witness for the District, who was lower than Thompson by almost $4,000. At any rate, the complaint goes to the weight rather than the competency of the testimony. Defendants also say under this point that the testimony should not have been admitted because the witness took into consideration the prices paid in condemnation. We know of no principle of law under which an expert witness on land values must exclude from consideration prices voluntarily paid and received in the course of condemnation proceedings. The point is overruled.

■ By their eighth point defendants complain of the admission of testimony by the witness Pounds as to the relatively low price at which John F. Grant sold property in the area in 1950 because the time was too remote in the light of booming prices thereafter. If there is anything in the statement under the eight points, with which this point is grouped, referring to the complained-of testimony of the witness, Horace E. Pounds, we have not located it. The point is, there-

fore, abandoned. However, it is actually somewhat related to the seventh point and we will discuss it under that point.

■■ By their ninth point defendants complain that the testimony of the valuation witness, Weldon Hornsey, was incompetent (a) "because he neither owned, sold, bought, leased or appraised any comparable land in the area" and (b) "he wholly failed to take into consideration the value of said land for its highest and best use." As to (a), Mr. Hornsey was shown to be, by business and profession, a real estate man engaged in that business, actively for nine years, familiar with real estate conditions generally and particularly with the southwest section of the City of Houston, dealing frequently with property in the particular area under inquiry. He was a member of the National Association of Real Estate Boards, Texas Real Estate Association, Past President of the Pasadena Real Estate Board, Chairman of the Educational Committee of the Texas Real Estate Association, and of the National Association for two years. Real estate appraisals were a regular part of his business. He had taken occasion to make an analysis and survey of the subject area with the intention of making an appraisal of the subject tract and he testified that he was competent and able to appraise and place a value of the property as of June 17, 1954. He was legally competent to testify on values, as ruled by the trial court. Whether in arriving at his appraisal he took into consideration the value of the land for its highest and best use was, of course for the jury as triers of the facts. The point is overruled.

Under their seventh point defendants complain of the admitting in evidence of testimony by the witness Pounds in respect to the price defendants paid for their property on November 18, 1949, assigning that the low price paid at that remote date was irrelevant and incompetent on the question of value on June 17, 1954, and highly prejudicial. As we have noted above, by their eighth point they complain of the admission of testimony concerning the sale by John F. Grant in March, 1950, of 1.03 acres of land claimed to be at a relatively low price.

Before further discussing these points, we quote 3A Tex.Jur., Title "Appeal and Error," Sec. 166, page 213, as follows:

"Section 166. Time of Objection.— An objection to the admission of evidence, to be available in an appellate court, must have been timely made. That is to say, the objection must have been made when the evidence was offered, and not after it had been introduced. Indeed the 'practice of permitting a question to be answered without objection, and, if perchance the answer be unfavorable, to then object to both question and answer, is not proper or fair practice.' Accordingly, if questions asked a witness are so framed as to apprise counsel of the nature of the answer attempted to be elicited, an objection comes too late when not made until the witness has fully testified. But if the incompetency does not appear until after testimony has been given, the proper practice is to move to have the evidence excluded in order that the point may be raised on appeal."

and the same volume and title, Section 164, page 209, where it is said "Even though an objection to testimony as improper is made, permitting the same testimony by subsequent witnesses without further objection may render the objection unavailing on appellate review."

See also Henderson v. Jimmerson, Tex.Civ. App.1950, 234 S.W.2d 710, 719, where it is said, "The rule is well established that error in admitting testimony is harmless if other evidence of the same facts are admitted and without complaint."

The proceedings to which we are referred under this point of error reflect that the witness Pounds testified that defendant, Dr. Hubbard, had advised him that the deed records properly reflected the price paid by Dr. Hubbard on November 18, 1949, for a larger tract of which the sub-

ject tract was a part. The following then occurred:

"Q. Will you describe that larger tract in relation to the smaller one we are talking about?

\* \* \* \* \* \*

"A. John F. Grant sold to Oscar E. Hubbard, tract of land containing 0.788 acre November 18, 1949, recorded December 7, 1950 in volume 2012 page 2, the land located in the R. W. Rowe Survey abstract 645.

"Q. What is the consideration shown? A. $2500.00.

"Q. What is the total acreage in that deed? A. 0.788 acre.

"Mr. Crystal: May we have our objection, being too remote as to valuation?

"The Court: Overruled.

"Q. Has any of that land subsequently been sold by Doctor Hubbard? A. Yes, sir.

"Q. Will you state the facts about that? A. Doctor Hubbard sold a little more than half of the acreage that he bought 0.788 acre and he sold to Paul R. Cook 0.413 acre—that was a little more than half of what he purchased, and the consideration for that was $1,000.00."

It will be noted that the objection to the testimony did not come at the time the witness stated the consideration shown by the deed nor, in fact until after the witness had answered a later question in response to which he gave the total acreage conveyed by the deed. It will also be noted that counsel did not move to instruct the jury to disregard the testimony but only asked to have his objection to the testimony as being too remote on valuation, which objection the court overruled. Whether as coming too late the record does not reflect. We are not referred to similar testimony later given by the witness Hornsey but note from our own study of the statement of facts that while the witness Hornsey

was on the stand he testified without objection or complaint by defendants to the Hubbard sale to Cook in 1949 and to the price which Hubbard had paid for the larger tract. This witness also testified without objection to the Grant sale in 1950, being of property adjoining that of Dr. Hubbard, totalling 1.03 acres, at $3,900 per acre.

We are inclined to agree with defendants because of very rapid increases in valuations and prices paid intervening between 1949–1950 and the valuation date at issue, that this testimony, had it been properly objected to, should not have been admitted but we are clear that under the authorities the point was waived by defendants for failure to make timely objection, for failure to move to instruct the jury not to consider the testimony and because they suffered other testimony of similar, not to say identical import, to be admitted without objection or complaint. Nor are we able to say on the whole record that the coming in of this testimony, even though not objected to, prejudicially affected the rights of defendants since the evidence given by all witnesses for the condemnor clearly reveals that these transactions in 1949 and 1950 were given but scant weight in arriving at their own estimates of value. Furthermore, no witness denied the rapid and large increases in valuations in the area generally between 1949–1950 and the valuation date at issue. We find no reversible error under either of these points.

Under points 11, 12, 13, 14, 18 and 19 appellants complain of the verdict as wholly inadequate and as contrary to the overwhelming weight and preponderance of the evidence. We overrule these points. It is true that defendants introduced evidence which would have justified a finding of a value of in excess of $3 per square foot for the land involved. None of these witnesses were shown to be any more competent than, if as competent as, witnesses for the condemnor, who valued the land at much lower figures. The jury verdict is for considerably less than the value placed on the land and improvements by the con-

demnor's witness Thompson but it is more than that placed on the same land and improvements by the condemnor's witness Hornsey. When we look at the whole record and consider the irregular dimensions of the tract, the fact that it is not only quite shallow in depth but subject to erosion, that unlike certain other lands in the area improvements would have to be supported by especially costly foundations and perhaps revetments, and to the further fact that the jury's verdict reflects a value of approximately $13,700 on an acreage basis for defendants' land, which compares favorably with the approximately $10,000 per acre price paid for better situated and located land directly across from the subject tract, we do not feel warranted in rejecting the jury's verdict which has ample and somewhat convincing proof in condemnor's testimony. Under our system it is solely the function of the jury to resolve conflicts in evidence such as those of which defendants complain and we have no authority to usurp that function. These points are overruled.

 By their last and twentieth point defendants complain of the refusal of the trial court to grant them a new trial on the grounds of newly discovered evidence, it being claimed that defendants, subsequent to the trial, unearthed for the first time the fact that the District did not propose to use all of the land for its own purposes but that it was to be devoted in part to a public highway.

It would appear from the record that defendants were in possession, during the course of the trial, of the very information upon which they rely as a basis for newly discovered evidence. However, wholly apart from the question of diligence their proof on this point which we have carefully considered is altogether inadequate. Its length and breadth is that defendants called to the stand the witness Coats, Chief Right of Way Agent for the condemnor. He was handed a map with which the witness testified he was familiar, as well as with "this drainage situation." The witness was then asked if the map showed Dr. Hubbard's property. He said

it did. He was later asked if the map showed a proposed widening of Wyndale Road to include a part of the subject property. The witness said it did. The map was then offered in evidence for the purpose of a bill, which appellants have not troubled to make any part of the statement of facts. There is no proof of when, where or by whom the map was made or that it truly reflected the purpose of the Flood Control District in instituting the condemnation proceedings.

No other or further proof on the question of newly discovered evidence was offered by them. Defendants wholly failed to make an adequate showing for a new trial on the basis of newly discovered evidence. The point is overruled.

Affirmed.